ELIZABETH BAUER, Appellant, *vs.* LOUIS GIESEMANN *et al.*
Appellees.

*Opinion filed December 17, 1913.*

WATERS—*when land owner cannot dig ditch to change natural flow of water.* If the water flowing naturally off of land at one point turns and comes back upon such land at another point, where it then flows onto other land, the owner may dig a ditch which will convey the water direct to the point where it flows back upon his land; but if the water which flows off the land does not turn and come back, the owner is not entitled to dig a ditch and carry the water direct to a point on his land where water from another source flows upon it and passes out over other land.

APPEAL from the Circuit Court of Madison county; the Hon. W. E. HADLEY, Judge, presiding.

WILLIAMSON, BURROUGHS & RYDER, for appellant.

E. G. HILL, and TERRY & GUELTIG, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

Appellant filed her bill in chancery in the circuit court of Madison county praying a mandatory injunction requiring the removal of an obstruction placed by defendants in a certain ditch therein described. An answer was filed denying the material allegations of the bill upon which complainant predicated her right to the relief prayed. Defendants to the original bill also filed a cross-bill praying for relief. The evidence was heard by the chancellor, who, after hearing it, went upon and viewed the premises, and entered a decree dismissing the original bill for want of equity and granting certain relief prayed in the cross-bill. An appeal was prosecuted by complainant to the Appellate Court for the Fourth District, and that court transferred the case to this court on the ground that, a perpetual easement being claimed by complainant in defendants' land, a

freehold was involved and the Appellate Court had no jurisdiction to entertain the appeal.

The bill alleges that for more than twenty-nine years complainant had owned, in fee simple, the west half of the south-west quarter of section 23, town 5, north, range 8, west of the third principal meridian, in Madison county; that in 1887 Fred Gaertner owned the eighty acres adjoining complainant on the east and that Henry Brockmeyer owned the one hundred and sixty acres immediately south of complainant's and Gaertner's land. Defendants became the owners of the Brockmeyer land about the year 1900, and, although it is not so alleged in the bill, as we understand it defendants also owned the forty acres adjoining complainant's south forty on the west, but whether they acquired title to that forty from Brockmeyer at the same time they purchased the one hundred and sixty acres is not clear. The bill alleges that about the year 1877, by mutual agreement and consent of all the then owners of the lands described, an open ditch or drain was constructed from a point near the line between complainant's and Gaertner's land, commencing at a point about one thousand feet south of the north line of said land and running south along or near the east line of complainant's land to the south-east corner thereof, thence south-westerly to an open ditch running south and south-westerly through the west eighty of the Brockmeyer land to a natural water-course which flowed southwardly into Cahokia creek; that the said ditches and water-course were used as a continuous drain for the said lands continuously until 1900, except that about 1885 Brockmeyer changed the course of the open ditch commencing at the south-east corner of complainant's land and ran it nearly due west along or near his north line to about the middle of the forty, instead of south-westerly, as it had theretofore run, and ran the ditch thence south to connect with the before described open ditch on the Brockmeyer land; that as thus changed the ditch continued to be used by the

owners of said lands for the purpose of draining surface waters naturally coming upon their respective lands, into Cahokia creek. Complainant claimed that under the act of 1889, entitled "An act declaring legal drains heretofore or hereafter constructed by mutual license, consent or agreement by adjacent or adjoining owners of land, and to limit the time within which such license or agreement heretofore granted may be withdrawn," she was entitled to a perpetual easement in the drain to have the water from her land flow through it. The bill prayed that defendants be decreed to restore the drain to the condition it was in under the mutual agreement of the parties interested, and that they be restrained from maintaining the dam or obstruction in the ditch near the south-east corner of complainant's land.

The answer denies that there was ever any agreement between the land owners to maintain a ditch south along or near the line between complainant's land and the Gaertner land lying east of it; denies that any such ditch ever was constructed, and denies that complainant has any license or easement to flow water over defendants' land.

The cross-bill alleges that complainant by a system of ditches diverted the natural flow of the water easterly over and across her land and brought it to the south-east corner and discharged it upon defendants' land, and that the increased flow of water brought down with it and discharged upon defendants' land large quantities of weeds and debris, and that defendants constructed a ditch south-east through their own land into Cahokia creek in order to prevent the spread of the water over their land and to obviate a suit for damages on account thereof. The cross-bill also charges that the complainant closed a natural water-course leading in an easterly direction by placing a dam across it, which caused waters to flow upon defendants' land. The cross-bill prayed an injunction requiring the removal of said dam and the cleaning out of said east and west water-course;

also that complainant be decreed to close the ditch constructed by her on the east side of her land and a ditch from a point near where a water-course passes through the Big Four railroad trestle, running thence south and south-easterly across complainant's land.

The lands described in the bill lie in Cahokia creek bottom. On the north and west is a range of hills. Cahokia creek to the south and south-east of the lands serves as an outlet for their drainage. The surface of the land is nearly level. The land lying east of complainant's land belonged to a man by the name of Gaertner, who sold it to the present owner, Springer, and it is referred to in the record as the Gaertner land. The land south of the Gaertner and Bauer land, also forty acres west of the south forty of the Bauer land, belonged to Brockmeyer, who sold to defendants. Many years before the defendants bought the Brockmeyer land the drainage from these lands was into Cahokia creek, which ran from the north-east to the south-west, a considerable distance south of the Bauer land. The surface waters from the Bauer, Gaertner and Brockmeyer lands lying south of the Bauer land discharged into a ditch which started at a point some distance east of the Bauer land and north of the Brockmeyer land. From the starting point the ditch ran south-west through the Gaertner land, crossing the division line between it and the Brockmeyer land a short distance east of the south-east corner of the Bauer land, continuing west and south-west through the Brockmeyer land south of the Bauer land, connecting with a water-course running south, which emptied into Cahokia creek nearly one-fourth of a mile south of the Bauer land. While Brockmeyer owned the land now owned by defendants he threw up a small levee on his own land along the division line between him and Bauer and extended the levee a short distance east of the Bauer south-east corner. Near said corner he placed a culvert through the levee, with an opening about eight by ten inches, to afford passage for

the water coming through the ditch at that point off the Gaertner and Bauer land. After the defendants bought the Brockmeyer land, in order, as they claim, to better drain their own land, without the consent or assistance of complainant or anyone else they made a ditch starting from a point a little east of the Bauer south-east corner and running thence south-east to Cahokia creek, but the defendants deny that they interfered with the old ditches except by the removal of a culvert through the Brockmeyer levee. About the time that this new ditch was completed, Tony Bauer, son and tenant of complainant, had a talk with defendants about draining the Bauer land through this new ditch, and an arrangement was made by which a ditch was to be constructed from the new ditch west along the south line of the Bauer land to the west line of complainant's. There was then a natural waterway along the south line of the Bauer land, leading from the west to the south-east corner. The purpose of the ditch was to enlarge the capacity of that waterway and carry surface water from defendants' forty lying west of the Bauer south forty, which had formerly spread over the south part of the Bauer land and defendants' land lying south of the Bauer land. This ditch was constructed by the joint labor of the complainant's tenant and defendants. From that time until the death of Tony Bauer, when Fred Franke, a son-in-law of complainant, succeeded him as tenant on the land, nothing further was done and the water discharged at the south-east corner of the Bauer land passed through the new outlet ditch. The Big Four railroad crossed the north part of the Bauer land from the north-east to the south-west and passed over a water-course through which water flowed from the north to south. In this water-course the railroad company placed a forty-two inch iron pipe for the passage of water from the north to the south. There is some conflict in the evidence, but its weight seems to show that in a state of nature the water coming from the north, after it passed the line

of the Big Four railroad, spread out, and a very considerable portion of it, at least, flowed through a depression east upon and over the Gaertner land before it found its way into the ditch, which carried it south-west into Cahokia creek. After Franke took possession of the land he obstructed the flow of the water east off the Bauer land and made a ditch commencing at the iron pipe under the railroad and running south and south-east to the south-east corner of the Bauer land, where it was discharged into the new ditch made by defendants. He also put a dam about the west line of the Bauer land across the ditch running east along the south line of the Bauer land, which obstructed the flow of water from defendants' land lying west of the Bauer land, and, defendants claim, caused it to flow south upon their land lying south of the Bauer land. The east and west ditch on the south side of the Bauer land appears to have filled up to a considerable extent, and complainant refused to clean it out or remove the obstruction at her west line, whereupon defendants placed a dam across their ditch near the south-east corner of the Bauer land and restored the culvert through the old levee of about the same capacity as the Brockmeyer culvert. It is this dam complainant seeks to have removed.

The court found and decreed that complainant, by the ditch south and south-east of the railroad and the obstruction to the natural flow east on the Gaertner land, diverted the natural flow of water from her land to the east and brought it upon defendants' land, and that she also obstructed and closed at the south-west corner of her land the natural water-course through which the water flowed east along the south end of her land, and which had been opened and enlarged by the joint action of the parties for their mutual benefit in draining the Bauer land and defendants' forty lying west of the said land. The decree further found that these acts of complainant brought vast quantities of water, weeds and debris upon the defendants' land

which did not previously or in a state of nature flow there; that from these acts of complainant defendants would continue to sustain irreparable injury, to prevent which defendants were justified in partially closing their ditch at the south-east corner of the Bauer land. Complainant's bill was dismissed for want of equity, and the court decreed, under the cross-bill, that complainant within sixty days close the north and south ditch from the railroad culvert through her land, remove all obstructions to the natural flow of water from her land in an easterly direction, so that it would flow as it had before said ditch was made and obstructions placed in the way. It was further ordered that complainant re-open the ditch or enlarged water-course leading from the west along the south end of her land, and that she forever maintain the east half of it. It was further ordered that defendants re-open and forever maintain the west half of said enlarged ditch or water-course, and for that purpose they were authorized to enter upon complainant's premises. Defendants were further ordered to remove the obstruction or culvert placed by them in a ditch at the south-east corner of the Bauer land and re-open same, so as to permit all water coming there across the south end of complainant's land and all water naturally coming there from her said land to flow unobstructed through said ditch south-east into Cahokia creek.

As is not unusual in such cases, the evidence was conflicting, in some respects, as to the natural flow of the water. The principal point of dispute in this respect is as to the flow of the water east off of complainant's land onto the Gaertner land and thence into the old ditch. We do not understand it is denied that there was a natural flow of water to the east, but it is contended by complainant that some years before defendants bought the Brockmeyer land, by mutual agreement a ditch was constructed along or about the line between the Gaertner and Bauer land, commencing at a point about one thousand feet south of the

Bauer north line and leading thence to the south-east corner of the Bauer land, through which the water flowing east was turned to and discharged at the south-east corner of the Bauer land. It appears that at some time there had been a ditch along the line between the Gaertner and Bauer land, but it had filled up until there was little or no trace of it and it was not carrying any water. By the decree complainant was authorized to construct or re-open a ditch on her east line to carry water that naturally flowed into it to the south-east corner of her land. We are of opinion the decree was a just and equitable one and that it was sustained by the law and the evidence. In addition to the chancellor seeing the witnesses and hearing their testimony he personally viewed the premises, and we cannot say the facts found in the decree are not supported by the evidence.

It is contended by complainant that the water which flowed off of her land east upon the Gaertner land finally came back again to her south-east corner, and that under the authority of *Fenton and Thompson Railroad Co.* v. *Adams,* 221 Ill. 201, she had a right, by the ditch from the railroad culvert, to bring the water directly to that point. The case referred to follows *Peck* v. *Herrington,* 109 Ill. 611, but is not in point here, for the reason that the evidence, or at least the weight of it, shows that the water which flowed east off of complainant's land did not turn and flow back upon it. If it had come back on complainant's land at her south-east corner she might have been justified in constructing a ditch that would bring it directly to that point, but she had no right to bring water to the south-east corner that naturally flowed off of her land a quarter of a mile or more north of said corner and never came back to her land.

We find nothing in the record that would justify disturbing the decree, and it is affirmed. *Decree affirmed.*